# UNITED STATES DISTRICT COURT
# WESTERN DISTRICT OF MICHIGAN

**ERVINE LEE DAVENPORT,**
MDOC Inmate #179762

        Petitioner

v                                     Civil Action No.  _____

**DUNCAN MACLAREN, Warden**
**Kinross Correctional Facility,**

        Respondent

_____/


## PETITION FOR WRIT OF HABEAS CORPUS

## MEMORANDUM OF LAW IN SUPPORT OF PETITION


**STATE APPELLATE DEFENDER OFFICE**

BY:   **VALERIE R. NEWMAN (P47291)**
      **Assistant Defender**
      State Appellate Defender Office
      645 Griswold, Suite 3300
      Detroit, MI 48226
      vnewman@sado.org

## UNITED STATES DISTRICT COURT
## WESTERN DISTRICT OF MICHIGAN

**ERVINE LEE DAVENPORT,**
MDOC Inmate #179762

               Petitioner

v                                        Civil Action No. _____

**DUNCAN MACLAREN, Warden**
**Kinross Correctional Facility,**

               Respondent

_____/

## <u>PETITION FOR WRIT OF HABEAS CORPUS</u>

Petitioner, **ERVINE LEE DAVENPORT,** respectfully states:

1.     Petitioner is a citizen of the United States, domiciled in Michigan, and is currently imprisoned in Chippewa County, Michigan. This case arose in Kalamazoo County, Michigan. Venue is proper in this Court for this habeas corpus case pursuant to W.D. Mich. LCivR 3.2.

2.     Petitioner is currently unconstitutionally detained and imprisoned by the Respondent, Warden Duncan MacLaren, in the Kinross Correctional Facility, where he is serving a non-parolable life term for first-degree murder, habitual offender fourth. (*People v. Ervine Lee Davenport,* Kalamazoo County Circuit Court Case No. 07-0165-FC)

3.     Petitioner has exhausted all state remedies available to him with regard to the constitutional issue raised in this petition by taking the following steps:

        a.   On July 18, 2008, Petitioner was convicted after a jury trial of first-degree murder.

        b.   Petitioner raised constitutional issues in a timely filed appeal of right in the Michigan Court of Appeals.

c.  On March 26, 2009, he timely sought a remand from the Michigan Court of Appeals for an evidentiary hearing to develop the factual basis for the shackling claim, a necessary predicate to the appellate court's ability to reach the merits of the underlying claim.

d.  On May 8, 2009, the Michigan Court of Appeals denied the motion to remand.

e.  On June 3, 2009, Petitioner filed his brief on appeal in the Michigan Court of Appeals, arguing, among other issues:

> I.  That his constitutional right to due process was violated where his left hand was shackled to his waist for most of the trial.

f.  On August 5, 2010, the Michigan Court of Appeals issued an unpublished decision affirming Petitioner's conviction. *People v. Ervine Lee Davenport,* unpublished opinion per curiam of the Michigan Court of Appeals, issued August 5, 2010 (No. 287767).

g.  Petitioner raised the same constitutional issue in his application for leave to appeal to the Michigan Supreme Court. In an order dated March 9, 2011, the Michigan Supreme Court remanded to the Circuit Court for an evidentiary hearing to determine whether the jury saw the Petitioner's shackles, and to determine whether the prosecution could demonstrate beyond a reasonable doubt that the shackling error did not contribute to the verdict against the Petitioner. *People v. Davenport,* 488 Mich. 1054 (2011).

h.  On June 24, 2011 and July 29, 2011, the evidentiary hearings were held in the Kalamazoo County Circuit Court.  The jurors were brought in to court and questioned under oath. The Circuit Court found that the shackles were visible, but ruled that it was harmless error based on the jurors' self-evaluation. See Brief in Support of Petition.

i.  Petitioner appealed as of right, and on March 2, 2012, Petitioner filed his brief on appeal in the Michigan Court of Appeals, arguing that:

> I.  Petitioner's Fourteenth Amendment right to due process was violated where he was shackled during trial, where the shackles were visible and seen by five jurors and the subject of comments heard by two additional jurors, and where the prosecution cannot demonstrate beyond a reasonable doubt that the shackling error did not contribute to the verdict.

j.  In an unpublished opinion dated December 13, 2012, the Michigan Court of Appeals found the shackling issue harmless and affirmed Petitioner's conviction.

*People v. Ervine Lee Davenport,* unpublished opinion per curiam of the Michigan Court of Appeals, issued December 13, 2012 (No. 306868).

k.  Petitioner raised the same constitutional issue in his application for leave to appeal to the Michigan Supreme Court. In an order dated July 3, 2013, the Michigan Supreme Court denied leave to appeal, but found that the Michigan Court of Appeals "erroneously failed to consider defendant's claim in light of the United States Supreme Court decision in *Holbrook v Flynn,* 475 US 560, 570; 106 S Ct 1340; 89 L Ed 2d 525 (1986)("the question must be not whether jurors actually articulated a consciousness of some prejudicial effect, but rather whether 'an unacceptable risk is presented of impermissible factors coming into play.'"), citing *Estelle v Williams,* 425 US 501, 505; 96 S Ct 1691; 48 L Ed 2d 126 (1976)". The Michigan Supreme Court found the error harmless under the facts of this case. *People v. Ervine Lee Davenport,* 494 Mich. 875 (2013).

4.      The time for filing a petition for writ of certiorari expire on October 1, 2013. Supreme Court Rule 13.1; 28 U.S.S. § 1257(a). Petitioner did not avail himself of the opportunity to petition for a writ of certiori in the United States Supreme Court.

5.      Petitioner's Fourteenth Amendment right to due process was violated where he was shackled during trial, where the shackles were visible and seen by five jurors and the subject of comments heard by two additional jurors, and where the prosecution cannot demonstrate beyond a reasonable doubt that the shackling error did not contribute to the verdict.

6.      Petitioner has not filed any previous Petition for Writ of Habeas Corpus in this or any other federal district court.

7.      The instant petition is timely brought within the one-year statute of limitations for habeas corpus actions under 28 U.S.C. §2244(d)(1)(A). The time for filing a petition for certiorari to the United States Supreme Court expired on October 1, 2013. Supreme Court Rule 13.1; 28 U.S.C. §1257(a). Petitioner did not avail himself of the opportunity to petition for a writ of certiorari in the United States Supreme Court. This petition is being filed within the one-year statute of limitations for habeas corpus actions, which expires on October 1, 2014, under 28 U.S.C. §2244(d)(1)(A). *Bronaugh v. Ohio,* 235 F.3d 280, 283 (6th Cir. 2000).

**THEREFORE,** Petitioner Ervine Lee Davenport requests:

A.      That Respondent be required to appear and answer the allegations in this Petition;

B.      That, after full consideration, this Court relieve Petitioner of the unconstitutional restraint on his liberty;

C.      That this Court grant such other, further, and different relief as the Court may deem just and proper under the circumstances; and

D.      That this Court grant oral argument in this matter.

                         Respectfully submitted,

                         **STATE APPELLATE DEFENDER OFFICE**

                         BY:     s/ Valerie R. Newman_____
                                 **VALERIE R. NEWMAN (P47291)**
                                 Assistant Defender
                                 645 Griswold, Suite 3300
                                 Detroit, Michigan  48226
                                 vnewman@sado.org
                                 (313) 256-9833

Dated:  September 25, 2014

**UNITED STATES DISTRICT COURT**
**WESTERN DISTRICT OF MICHIGAN**

**ERVINE LEE DAVENPORT,**
MDOC Inmate #179762

    Petitioner

v              Civil Action No. _____

**DUNCAN MACLAREN, Warden**
**Kinross Correctional Facility,**

    Respondent

_____/

**MEMORANDUM OF LAW IN SUPPORT OF PETITION**

# **TABLE OF CONTENTS**

TABLE OF AUTHORITIES ........................................................................................ i

STATEMENT OF QUESTIONS PRESENTED......................................................... iii

STATEMENT OF PROCEEDINGS AND FACTS .......................................................1

STANDARD OF REVIEW ........................................................................................18

I.  PETITIONER WAS DENIED HIS STATE AND FEDERAL CONSTITUTIONAL RIGHT TO DUE PROCESS WHERE HE WAS SHACKLED DURING TRIAL, WHERE THE SHACKLES WERE VISIBLE AND SEEN BY FIVE JURORS AND THE SUBJECT OF COMMENTS HEARD BY TWO ADDITIONAL JURORS, AND WHERE THE PROSECUTION FAILELD TO DEMONSTRATE BEYOND A REASONABLE DOUBT THAT THE SHACKLING ERROR DID NOT CONTRIBUTE TO THE VERDICT.........20

SUMMARY AND RELIEF REQUESTED ................................................................35

# <u>TABLE OF AUTHORITIES</u>

## CASES

*Barker v. Yukins*, 199 F.3d 867 (6th Cir. 1999) ...................................................................... 35, 36

*Bell v. Cone*, 535 U.S. 685, 122 S.Ct. 1843, 152 L.Ed.2d 914 (2002) ......................................... 21

*Brecht v. Abrahamson*, 507 U.S. 619, 113 S.Ct. 1710, 123 L.Ed.2d 353 (1993) .................. 32, 35

*Bronaugh v. Ohio*, 235 F.3d 280 (6th Cir. 2000) ......................................................................... 3

*Brumley v. Wingard*, 269 F.3d 629 (6th Cir. 2001) .................................................................... 21

*Calderon v. Coleman*, 525 U.S. 141, 119 S.Ct. 500, --- L.Ed.2d ---- (1998) .............................. 32

*Chapman v California*, 386 U.S. 18, 87 S.Ct. 824, 17 L.Ed 2d 705 (1967) ........................... 27, 28

*Deck v. Missouri*, 544 U.S. 622, 125 S.Ct. 2007, 161 L.Ed.2d 953 (2005) ......................... passim

*Estelle v Williams*, 425 U.S. 501; 96 S.Ct. 1691; 48 L.Ed.2d 126 (1976) ................... 3, 20, 29, 37

*Fast Air, Inc. v. Knight*, 235 Mich.App. 541, 599 N.W.2d 489 (1999) ....................................... 10

*Gibson v. Clanon*, 633 F.2d 851 (9th Cir.1980) ......................................................................... 32

*Holbrook v. Flynn*, 475 U.S. 560 ; 106 S.Ct. 1340; 89 L.Ed.2d 525 (1986) ....................... passim

*Illinois v. Allen*, 397 U.S. 337, 90 S.Ct. 1057, 25 L.Ed.2d 353 (1970) ..................... 22, 23, 24, 25

*In re Winship*, 397 U.S. 358, 90 S.Ct. 1068, 25 L.Ed.2d 368 (1970) .......................................... 24

*Lakin v. Stine*, 431 F.3d 959 (6th Cir. 2005) .............................................................................. 29

*Larson v. Palmateer*, 515 F.3d 1057 (9th Cir. 2008) ................................................................. 30

*Mitchell v. Esparza*, 540 U.S. 12, 124 S.Ct. 7, 157 L.Ed.2d 263 (2003) ................................... 22

*People v. Davenport*, 488 Mich. 1054 (2011) ...................................................................... passim

*People v. Ervine Lee Davenport*, 494 Mich. 875 (2013) ............................................. 3, 20, 25, 29

*Price v. Vincent*, 538 U.S. 634, 123 S.Ct. 1848, 155 L.Ed.2d 877 (2003) .................................. 29

*Rhoden v. Rowland*, 10 F.3d 1457 (C.A. 9, 1993) ................................................................. 10, 31

*Rhoden v. Rowland*, 172 F.3d 633 (9th Cir. 1999) ................................................................ 31, 32

*Sochor v. Florida*, 504 U.S. 527, 112 S.Ct. 2114, 119 L.Ed.2d 326 (1992) ............................... 28

*Sullivan v. Louisiana*, 508 U.S. 275, 113 S.Ct. 2078, 124 L.Ed.2d 182 (1993) ........................... 35

*Taylor v. Kentucky*, 436 U.S. 478, 98 S.Ct. 1930, 56 L.Ed.2d 468 (1978)................................... 24

*Williams v. Taylor*, 529 U.S. 362, 120 S.Ct. 1495, 146 L.Ed.2d 389 (2000) ........................ 21, 22

*Zant v. Stephens*, 462 U.S. 862, 103 S.Ct. 2733, 77 L.Ed.2d 235 (1983) .................................... 27

## CONSTITUTIONS, STATUTES, COURT RULES

28 U.S.C. §2244(d)(1)(A) .......................................................................................................... 3

28 U.S.C.§ 2254 ...................................................................................................................... 22

28 U.S.C.§ 2254(d) ................................................................................................................. 29

28 U.S.C. § 2254(d)(1) ...................................................................................................... 21, 22

28 U.S.C. § 2254(d)(1)-(2) ..................................................................................................... 21

28 U.S.C. § 2254(d)(2) ............................................................................................................ 22

28 U.S.C. §1257(a) ................................................................................................................... 3

F.R.Civ.P. 15 (a) ................................................................................................................. 4, 38

MCR 7.302(H)(1) ................................................................................................................... 10

M.C.L. § 750.316 ..................................................................................................................... 4

M.C.L. § 769.12 ....................................................................................................................... 4

## <u>STATEMENT OF QUESTION PRESENTED</u>

I.   WAS PETITIONER DENIED HIS FEDERAL CONSTITUTIONAL RIGHT TO DUE
PROCESS WHERE HE WAS SHACKLED DURING TRIAL, WHERE THE SHACKLES
WERE VISIBLE AND SEEN BY FIVE JURORS AND THE SUBJECT OF COMMENTS
HEARD BY TWO ADDITIONAL JURORS, AND WHERE THE PROSECUTION
FAILED TO DEMONSTRATE BEYOND A REASONABLE DOUBT THAT THE
SHACKLING ERROR DID NOT CONTRIBUTE TO THE VERDICT?

State Courts answer, "No".

Petitioner answers, "Yes".

## <u>STATEMENT OF PROCEEDINGS AND FACTS</u>

Petitioner ERVINE LEE DAVENPORT was convicted of first-degree murder, M.C.L. §

750.316, after a jury trial in the Kalamazoo County Circuit Court, the Honorable Pamela

Lightvoet presiding. He was enhanced as an habitual offender, fourth offense, M.C.L. § 769.12.

On August 25, 2008, Petitioner was sentenced to life imprisonment.  Petitioner seeks to appeal

the Michigan Appellate Courts' decisions affirming his conviction and sentence.


**Trial – July 2008**

During trial, Petitioner was shackled with a belly chain, a wrist shackle on his left hand,

and leg shackles.[1] His right hand was uncuffed to allow him to write notes to defense counsel

during trial.  Petitioner objected to the judge's decision to shackle him, but was overruled (T I,

20-23, 113).[2]   The record reveals that Judge Lightvoet made none of the pretrial findings

necessary to warrant shackling (T I, 20-23).

The instant case involved the death of Annette White on January 12, 2007.  The

prosecution alleged that Petitioner strangled Ms. White while they were arguing in a car, and

then Petitioner dumped her body in the woods.  The defense maintained that Petitioner acted in

self-defense, after Ms. White produced a box cutter during the argument.

An autopsy performed by Dr. Brian Hunter, a forensic pathologist, revealed that the cause

of death was manual strangulation (T II, 397-404).  Dr. Hunter testified that the body weighed

103 pounds and was 62 inches in length at the time of the autopsy (T II, 396-397).  At the time of

---

[1] At the time of trial, Petitioner was a 43-year-old African-American male who was 6'5" tall and weighed 270 pounds. See Basic Information Sheet of Presentence Investigation Report.
[2] For purposes of this brief, the trial transcripts will be referred to as T, followed by the volume and then the page number(s) cited. T refers to the transcripts from July 8, 2008 through July 18, 2008. There are a total of eight volumes. EHT refers to evidentiary hearing transcripts from June 24, 2011 and July 29, 2011.

her death, there was cocaine in her system and she had a blood alcohol level of .12  (T II, 410-413).

During questioning by Captain Mallery, Petitioner said that he had killed Ms. White, but that it was in self-defense after she had produced a box cutter during an argument in the car.  He said that they had been smoking crack and she started acting crazy.  When she produced a box cutter, he said that he reached across and held her back by her throat.  When she slumped down in the seat, he drove over to Blakeslee and placed her body in the woods.  He signed a written statement to this effect (T IV, 808-810; see also T V, 936-943).

Gary Latham processed the car that Petitioner was driving. Latham testified that when he first processed the multiple items in the car, he did not find a box cutter.  However, after receiving a phone call from the prosecutor about a month prior to trial, Latham found a box cutter inside a tool bag that had been in the car but not inventoried earlier (T II, 461-474).

Earl Carswell testified that he saw Annette White with Petitioner during the evening hours of January 12, 2007 when they were at the Carswell's apartment. Earl Carswell testified that they were drinking alcohol and smoking crack cocaine.  He said Ms. White had started getting crazy when she and Petitioner left Carswell's home about 2:30 a.m. (T III, 537-552). Mrs. Carswell described Ms. White as being "kind of weirded out" and "strange" that night (T III, 562-563, 571-575).

The prosecution also presented evidence that in the days after Ms. White's death, Petitioner went into a K-Mart store and changed his shoes (T III, 646-648, 652-653). The police recovered a pair of blue tennis shoes from the shoe department at K-Mart (T III, 672-677, 697, 706-711). Gerald Luedecking, a crime lab specialist, opined that the shoes in Exhibit 28 had the same class characteristics as the shoe impressions (Exhibits 23, 24 and 27) taken at the scene

where the body was found.  He testified that the shoes in Exhibit 28 were the exact same size and could have made the impressions. Due to the lack of accidental characteristics, he was unable to say definitely that they matched (T II, 386-387, 430-431, 434-438).

Petitioner's cousin, Marvin Fraction, testified that Petitioner occasionally stayed with him in January 2007.  During that time period, Petitioner gave him a dehumidifier and a stereo with speakers.  He identified Exhibits 42 and 43 as photos of the dehumidifier and the speakers. Mr. Fraction turned these items over to the detectives (T III, 598-605).

Kenneth Cooper testified regarding a prior incident.   He observed Petitioner choke Cooper's girlfriend, Leslie Snook, on January 8, 2007.  Cooper testified that Petitioner put his hands around Snook's throat and lifted her off the floor, and that Snook passed out.  Cooper was not there when the incident started, but he said that Snook and Petitioner had been arguing all day.  Cooper did not think the incident was serious enough to call the police (T III, 712-719). Leslie Snook testified that she and Petitioner had exchanged words prior to him choking her. She did not report the incident to the police because she had outstanding warrants (T III, 721-726). Petitioner denied the allegations about this incident (T V, 866-867; T VI, 1071-1072).

After the prosecution rested (T V, 961), the defense called Andre Randall as a defense witness.  He had known Annette White for 6-9 months, while they lived in the same apartment building.  He testified that she had a reputation for being a "spitfire", and she was always in conflict with someone in the building, including physical conflicts (T V, 966-967). He confirmed that he was initially a suspect in this case and that he was questioned by the police for ten hours (T V, 967-980).

Arthur Spann testified that he had known Annette White for a couple of years.  He testified that she had a reputation for getting angry when she smoked crack cocaine (T VI, 1002-1004).

Petitioner took the stand and confirmed that he knew Annette White.  He testified to a prior instance where she grabbed a knife and kicked him out.  He did not report the incident because it involved drugs (T VI, 1014-1016).  He described another incident when she was going through Tonya's belongings and he ordered her to leave; when she refused to leave, he took her by the arm and tried to walk her to the door.  However, she grabbed a pot off the stove and started swinging it at him (T VI, 1017-1018).

With regard to January 12, 2007, Petitioner saw Annette White about noon when she was yelling at Andre Randall about her broken arm.  At some point later in the day, Petitioner left with his girlfriend, Tonya Murray, and Andre Randall to get some money and to go to the store (T VI, 1018-1020).  He confirmed that he was in the car with Annette White about 2:00 a.m. and that they went to two areas to buy some drugs.  While they were on Woodbury Street, Ms. White was yelling at someone named Todd (T VI, 1020-1023).  They then went to the Carswells' residence, where they drank beer and smoked crack, and Ms. White was arguing with both Mr. and Mrs. Carswell.  When they left the Carswells' residence, Petitioner planned to take Ms. White to her residence.  Petitioner was driving a Buick that he got from Tracie Goltzene in exchange for giving her crack (T VI, 1023-1031).

When they got in the car, Petitioner was trying to calm Ms. White down. She complained that it was hot and started removing her clothes. She proceeded to try to smoke more crack in the car, but became agitated when it didn't work.  She demanded that Petitioner take her to an apartment on Alamo Hill, but Petitioner refused. She grabbed the steering wheel twice and

4

Petitioner pushed her back each time.  She started yelling and kicking, and then she pulled a box cutter from her side.  Petitioner thought it was a knife; he learned it was a box cutter later. She started swinging the box cutter at him and hit his right arm with it.  Petitioner was afraid that she might hit his neck with the box cutter.  He pushed her towards the other side of the car, but she continued to swing the box cutter at him.  He grabbed her under the chin, on her chest, and pinned her up against the other side of the car.  She dropped the box cutter, but started kicking. When he grabbed her again, she reached over and scratched Petitioner's face.  He intended to hold her back until he got to her house, but at some point he realized that she was no longer struggling.  He thought she had calmed down, but when he pulled the car over, he discovered that she wasn't breathing (T VI, 1033-1046).  In a panic, he drove around trying to figure out what to do.  He considered calling the police, but he and the police were not friends.  He left Ms. White's body in a field and drove to his mother-in-law's (Lenora Stewart) house in Portage.  He talked to his mother-in-law and then returned to the north side of town, and then to Marvin's (T VI, 1046-1052).

Petitioner confirmed that he told Captain Mallery the truth and that he was remorseful (T VI, 1075-1076).  He denied that he tried to rob or rape Ms. White (T VI, 1080).  He displayed a scar on his arm that he sustained from Ms. White during the incident (T VI, 1149-1150).

After the defense rested (T VI, 1154), the prosecutor called six rebuttal witnesses. Det. Beauchamp testified in rebuttal that during the interview, Petitioner said that Ms. White did not strike him with the weapon.  He said that his clothes may have been damaged, but that he was not damaged himself.  He also did not say that there was a jacket with a tear in it (T VI, 1155).

Leslie Snook was recalled as a rebuttal witness.  She testified that she did not have a romantic and/or sexual relationship with Petitioner, and that she did not touch him.  She also denied that she was acting as a prostitute for Ken Cooper (T VI, 1161-1162).

Leslie Willson, a parole officer, testified that she supervised Annette White while she was on parole.  She opined that Ms. White did not have a reputation for violence; however, Ms. Willson admitted that she did not see Ms. White outside of the parole office contacts, that she did not speak to Andre Randall or other people who lived in Ms. White's community, and she did not see Ms. White smoke crack (T VI, 1166-1172).

Julie Clark, a supervisor at the probation and parole office, testified that she supervised Ms. White from 2001 to 2004.  She opined that Ms. White was not a violent person in the office. Ms. Clark acknowledged that Ms. White had "a lot of problems with drugs and alcohol", and that she absconded from supervision on a number of occasions (T VI, 1174-1176).

The prosecution's last rebuttal witness was Dr. Brian Hunter. He testified that Petitioner's claim that he did not choke Ms. White, but instead pushed her with a flexed hand, was not possible.  Dr. Hunter explained that the injury pattern was not consistent with a broad force placed across the area; rather the injuries were on either side of the ridge and were more consistent with choking than with a broad pressure (T VII, 1193-1194).  On cross, he indicated that it was possible for the hemorrhaging locations to differ, depending on the size of the hand (T VII, 1195).

After arguments by counsel and instructions by the judge which included self-defense (T VIII, 1276-1278), the jury deliberated and returned with a verdict of guilty of first-degree murder (T VIII, 1308). On August 25, 2008, Petitioner was sentenced to mandatory life imprisonment (ST 11).

**State Appellate Proceedings on Direct Appeal Regarding Shackling**

Petitioner fully preserved this issue under State law when defense counsel objected to the shackling both prior to and during voir dire (T I, 20-23, 113). The record reveals that Judge Lightvoet made none of the pretrial findings necessary to warrant shackling (T I, 20-23).

After appealing his convictions as of right, Petitioner obtained an order from the Michigan Supreme Court which held that: 1) defense counsel adequately preserved the shackling issue at trial; 2) that Petitioner was entitled to an evidentiary hearing to develop the record "of whether his shackling during trial prejudiced his defense"; and 3) that "[i]f it is determined that the jury saw the defendant's shackles, the circuit court shall determine whether the prosecution can demonstrate beyond a reasonable doubt that the shackling error did not contribute to the verdict against the defendant." *People v. Ervine Lee Davenport,* 488 Mich. 1054 (SC #141832, 3/9/2011). The Michigan Supreme Court's Order in its entirety is as follows:

> "On order of the Court, the application for leave to appeal the August 5, 2010 judgment of the Court of Appeals is considered and, pursuant to MCR 7.302(H)(1), in lieu of granting leave to appeal, we REVERSE the Court of Appeals order denying the defendant's motion to remand for an evidentiary hearing. The defendant should have been permitted to develop the record on the issue of whether his shackling during trial prejudiced his defense. See *Rhoden v. Rowland,* 10 F.3d 1457, 1460 (C.A. 9, 1993). We also REVERSE the Court of Appeals determination that the defendant did not preserve the issue of whether his shackling during trial constituted a due process violation, because defense counsel requested that both of defendant's hands be unshackled to avoid the prejudice that would result if the jury saw the shackles, and the circuit court denied her request. See *Fast Air, Inc. v. Knight,* 235 Mich.App. 541, 549, 599 N.W.2d 489 (1999); trial transcript Volume I, p 113. If it is determined that the jury saw the defendant's shackles, the circuit court shall determine whether the prosecution can demonstrate beyond a reasonable doubt that the shackling error did not contribute to the verdict against the defendant. *Deck v. Missouri,* 544 U.S. 622, 635, 125 S.Ct. 2007, 161 L.Ed.2d 953 (2005). We REMAND this

case to the circuit court for further proceedings consistent with this order. In all other respects, leave to appeal is DENIED, because we are not persuaded that the remaining questions presented should be reviewed by this Court.

We do not retain jurisdiction."

*People v. Ervine Lee Davenport,* 488 Mich. 1054 (SC #141832, 3/9/2011).

Pursuant to the Michigan Supreme Court's order, evidentiary hearings were held on June 24, 2011 and July 29, 2011 in the Kalamazoo County Circuit Court.  In a memorandum filed prior to the evidentiary hearings, undersigned counsel maintained that the scope of the questioning of the jurors on remand was limited to whether they observed the shackles.  The scope of the questions to the jurors on remand was discussed at the beginning of the hearing on June 24, 2011 (EHT 6/24/11, 6-9). Undersigned counsel argued that although it was permissible to question the jurors regarding whether they observed the shackles, it was not appropriate to question the jurors about whether it affected their verdict (EHT 6/24/11, 8-9).  The Circuit Court ruled that the jurors could be questioned about whether they observed the shackles and whether it influenced their decision. Judge Lightvoet noted that she was not in the jury room during deliberations and that "some of the best evidence that we can get on that issue is asking the jurors themselves." (EHT 6/24/11, 9-11).

At the evidentiary hearings, Petitioner established that the shackles were visible and actually seen by five of the jurors during trial. Some of these jurors observed the shackles during voir dire, others observed them and/or discussed them throughout this eight day trial, and some had discussions or made comments about the shackles as late as the sixth day of trial when Petitioner took the witness stand.  Some of these jurors saw the handcuffs, some observed the belly chain, and some observed the leg/foot shackles. See Rooseboom (EHT 6/24/11, 14-15);

Jankord (EHT 6/24/11, 36-37, 40-42); Lewis (EHT 6/24/11, 48-49); Vanderveen (EHT 6/24/11, 81-84, 86, 88); and Whately (EHT 6/24/11, 99-102, 104) (see detailed summary of the extent of the jurors' observations *infra*).  Another juror (Padgett) did not see the restraints, but heard 2-3 comments from other jurors about the restraints (EHT 6/24/11, 59-62, 72-73). Another juror (Kucera) did not see the restraints, but noticed that Petitioner had limited movement and could only write with one hand during trial; he also heard one comment from another juror in the hallway about the restraints (EHT 7/29/11, 17, 19).

After briefing by the parties, the Circuit Judge issued a written opinion dated October 20, 2011.  Judge Lightvoet found first that, "There is no question that, despite the precautions taken, many of the jurors were able to observe Defendant's shackles/restraints during the trial. This is clear from the testimony of the jurors and not disputed in the parties' briefs." See Judge Lightvoet's Opinion After Remand From the Michigan Supreme Court dated 10/20/11, p 2. Judge Lightvoet then found that the prosecution had met its burden of demonstrating beyond a reasonable doubt that the fact that Defendant was shackled/restrained did not contribute to the jury's guilty verdict. *Id.,* at pp 2-3.  In making this finding, Judge Lightvoet relied solely on the jurors' testimony at the evidentiary hearings:

> "The Court finds that the Prosecution has met its burden. There was not one juror who testified the shackling issue affected their verdict. They testified the issue was not discussed during deliberations and they confirmed the verdict was based only on the evidence.  The jurors who observed the handcuffs or shackles went on to testify that the procedure was not a surprise or unexpected. They understood it to be 'routine', 'part of the procedure', for 'security', not unusual given the charge and/or not unusual in a murder trial. There was no evidence/testimony that the shackles/restraints was significant to the jurors or made them more inclined to find the Defendant guilty. There was no testimony that indicated Defendant's shackles/restraints contributed to the guilty verdict. The Prosecution has met its burden on this issue through the testimony of the jurors.

WHEREFORE, the Court finds beyond a reasonable doubt that the shackling of Defendant during the Trial did not affect the juror's verdict in this case." *Id.,* at pp 2-3 [footnotes omitted].

**Testimony at Post-Remand Evidentiary Hearings Regarding Shackles**

Although it is not disputed that the jurors were able to observe Petitioner's shackles, undersigned counsel provides the following summary of the jurors' testimony on remand to provide this Court with the extent of the shackling, the extent of the jurors' observations and comments, and the resulting prejudice. As noted in the Argument, *infra,* this case clearly was *not* a brief or inadvertent glimpse of a defendant in shackles.

Kali Roseboom observed Petitioner's handcuffs on the first day of trial during jury selection. She was sitting in the front row of the gallery right by Petitioner (EHT 6/24/11, 14-15).

Robert Jankord observed that one Petitioner's hands was cuffed when Mr. Jankord was seated in the jury box during jury selection (EHT 6/24/11, 36-37). Mr. Jankord also observed the belly chain while he was sitting in the gallery during jury selection. He recalled seeing Petitioner's hands cuffed to the belly chain (EHT 6/24/11, 40-41). He also noticed that Petitioner had limited movement at the table when he had his hands up on his legal pad (EHT 6/24/11, 42). Mr. Jankord could not recall if he observed any leg shackles. When asked if leg shackles would have any significance to him, he testified that it would be "an extra measure of security for the people and family and stuff in the courtroom." (EHT 6/24/11, 38-39). He opined that the purpose of the shackling and the deputies in the courtroom was for security; he "absolutely" thought that Petitioner might be dangerous (EHT 6/24/11, 43). He added that he presumed he was dangerous because of the nature of the case (EHT 6/24/11, 45).

10

Bradley Lewis testified that a couple of days into the trial another juror noticed that Mr. Davenport was restrained and pointed it out; the other juror said, "oh it looks like he is handcuffed." Mr. Lewis believed that the comment was made while they were sitting in the jury box.  He testified that the comment was made to a couple of the jurors that were sitting right next to Mr. Lewis.   After the comment, Mr. Lewis noticed that Petitioner was wearing a restraint (EHT 6/24/11, 48-49).  When they returned to the jury room that day, he believed a couple of the jurors discussed the restraints for a minute or two (EHT 6/24/11, 51).  During jury selection, he was seated in the second or third row on the right hand side of the gallery; he could not recall if he saw the belly chain (EHT 6/24/11, 53-54).

James Vanderveen testified that his memory was "fuzzy" after three years, but he recalled either seeing a handcuff or ankle bracelets on Petitioner, or hearing other jurors discussing Petitioner's handcuffs (EHT 6/24/11, 81-82).  Mr. Vanderveen also saw the belly chain.  His observations occurred during the first few minutes or first few hours of the whole process, but he could not recall if he observed them from the gallery during voir dire or from the jury box (EHT 6/24/11, 84, 88).  When questioned by the Court, Mr. Vanderveen recalled that there was "a comment or so" by another juror near the beginning of trial to the effect of "did you see handcuffs?" He could not recall which juror made this comment (EHT 6/24/11, 85).  When the prosecutor resumed questioning Mr. Vanderveen, he testified that he believed he saw the leg shackles, but he would "not bet my life on it." (EHT 6/24/11, 86).  There may have been a comment as the jurors walked down the aisle about "he had shackles on or that kind of thing." However, there was no discussion that he recalled (EHT 6/24/11, 86-87).  Mr. Vanderveen acknowledged that there were 2-3 deputies in the courtroom during trial; when he saw the restraints, he assumed that Petitioner might be dangerous (EHT 6/24/11, 89).  He wasn't fearful

but he felt safer knowing that Petitioner was charged with murder one and that he was shackled (EHT 6/24/11, 90).  Upon further questioning by the prosecutor, Mr. Vanderveen didn't know if the shackling "would necessarily make him more dangerous, maybe it was protocol." (EHT 6/24/11, 91). He wouldn't view the shackling as unusual, given the murder charge. *Id.*

Michael Whately noticed that Petitioner "is a big guy" (EHT 6/24/11, 98).  Mr. Whately testified that near the beginning of the trial, he observed shackles on Petitioner's feet.  It was on the first day of trial during jury selection, but he could not recall if he was in the jury box or in the back gallery portion of the courtroom.  During jury selection, he was seated in the second or third row from the back and closer to the window.  In the jury box, he was in the front row (EHT 6/24/11, 99-100, 104).  His observation was longer than a brief glimpse.  From where Mr. Whately was sitting, he could see the foot shackles "the whole time that he was sitting there" (EHT 6/24/11, 101).  Mr. Whately pointed it out to the juror sitting next to him; it was a comment rather than a discussion. *Id.*   Mr. Whately testified that on one occasion during trial, he also observed that Petitioner was wearing handcuffs.  He did not recall when he made this observation (EHT 6/24/11, 101-102).  Mr. Whately recalled that there were at least three deputies if not more in the courtroom during the trial; he thought there was a deputy was standing next to Petitioner when he testified, but he could not "remember for sure" (EHT 6/24/11, 105).  Based on the murder charge, Mr. Whately thought Petitioner "could be dangerous, but I didn't think he would do something in here." (EHT 6/24/11, 106).

Jennifer Padgett testified that she did not recall seeing Petitioner in restraints, but another juror had mentioned something about it; the other juror said that Petitioner was restrained, and that it was the reason for the curtain (table skirt). She testified that this conversation probably occurred in the middle of trial during lunch time conversation; although she admitted she could

not remember and it could have occurred in the jury room (EHT 6/24/11, 59-62).  Ms. Padgett explained that her seat in the jury box was in the front row at the end.  She felt nervous when one of the shackled witnesses testified, but there was a deputy standing right there (EHT 6/24/11, 63-66).   Upon questioning by the Court, Ms. Padgett gave additional details regarding the conversation with the other juror.  After the other juror asked if all the guards made her nervous, she said she was feeling alright about it.  The other juror then said, "well he is restrained."  When Ms. Padgett said she didn't notice, the other juror said, "that is why there is a curtain there so it doesn't influence what we think."   She could not recall where the conversation occurred, but believed it occurred during "towards the beginning" (EHT 6/24/11, 66-68).

Ms. Padgett also testified that when Petitioner testified, "they were sure --  there were more guards because he wasn't [restrained]." (EHT 6/24/11, 68). Because she was probably the closest to Petitioner when he testified, the other juror asked if that made her nervous (EHT 6/24/11, 68-69).  She clarified that these were two separate comments – one about the table skirt and the other about how close she was to Petitioner when he was testifying (EHT 6/24/11, 72). She believed that the timing of the one comment was after Petitioner testified and that it was "That is why we had to go out because they needed to move him." (EHT 6/24/11, 73).

Shawn Kucera testified that he did not see any restraints.  However, when the jury was escorted out to the hallway, another juror mentioned that "he might have been restrained and that is probably why we had moved out." (EHT 7/29/11, 17).  Mr. Kucera noticed that Petitioner was only able to write with one hand during the course of the trial (EHT 7/29/11, 19).

Hannah Decamp acknowledged that it had been three years since the trial, and she was having a hard time remembering.  She admitted that it was possible she saw the restraints but she just could not remember (EHT 6/24/11, 29-30).

Four jurors testified that they did not see any restraints:  Thomas Ruzick (EHT 6/24/11, 76), Thomas Vandermeulen (EHT 6/24/11, 94-95), Sarah Engster (EHT 7/29/11, 4-8), and Mark Weishaar (EHT 7/29/11, 10-13).

Over defense counsel's objection (EHT 6/24/11, 8-11), the prosecutor was allowed to question the jurors about whether the shackles were discussed during deliberations and whether the shackles affected their verdict.  All of the jurors who observed the shackles and/or heard a comment about the shackles testified that they did not discuss the shackles during deliberations and that the shackles did not affect their verdict (EHT 6/24/11, 16-17, 32, 37-40, 51-52, 61-62, 83, 87, 100-103; EHT 7/29/11, 17).

The prosecutor questioned the jurors about whether they noticed Petitioner's attire at trial. Most of the jurors (seven) noticed that Petitioner was wearing an orange jail uniform at the beginning of the trial (EHT 6/24/11, 14-15, 27, 36, 59, 81, 91, 98).   Jurors Lewis, Ruzick, Engster, Weishar, and Kucera did not recall seeing the orange jail uniform.

Juror Vanderveen said that the jail uniform's significance was that Petitioner was incarcerated (EHT 6/24/11, 81).  Mr. Whately recognized that the jail uniform meant he was in the county jail (EHT 6/24/11, 99).

After sitting in various seats of the jury box and the gallery, the prosecutor stipulated that there were areas in the courtroom where the handcuffs and belly chain were visible depending on the following factors: where one was seated in the jury box and the gallery, the location of the podium, whether anyone was seated in front of them, and on how Petitioner was positioned (EHT 6/24/11, 114, 118).  With respect to the jury box, the prosecutor agreed that the wrist shackle was visible depending on the following factors:  how the Defendant was positioned, how the juror was positioned, where the juror was looking, the podium's position, and the position of

14

the attorney at the podium (EHT 6/24/11, 120).  The prosecutor believed that the record showed the black curtain around the tables was present during trial and that the leg shackles were not visible (EHT 6/24/11, 120).

Defense counsel stipulated that depending on whether Ms. Eifler (the trial attorney) was seated or standing at the lectern, the left wrist shackle and dangling handcuff were visible in every row on the right side (window side) of the gallery, except the last row.  It was more difficult to see on the left side of the gallery, but there were some places where it was visible. Defense counsel also stipulated that the shackles, including the dangling right cuff, were visible from the aisle when jurors walked up the aisle during jury selection (EHT 6/24/11, 114-115, 118-119).  With regard to the jury box, defense counsel noted that the wrist shackle was visible from every seat in the box (both if juror was seated or standing), depending on whether someone was standing at the lectern.  The belly chain was not visible from the jury box (EHT 6/24/11, 119-120).

Judge Lightvoet also noted for the record that the day before the hearing, she went to the one end of the jury box and determined that "you probably would have been able to see the cuffs depending on where Petitioner was, his seat and so forth." (EHT 6/24/11, 116-117).

After briefing by the parties, the Circuit Judge issued a written opinion dated October 20, 2011.  Judge Lightvoet found first that, "There is no question that, despite the precautions taken, many of the jurors were able to observe Defendant's shackles/restraints during the trial. This is clear from the testimony of the jurors and not disputed in the parties' briefs." See Judge Lightvoet's Opinion After Remand From the Michigan Supreme Court dated 10/20/11, p 2. Judge Lightvoet then found that the prosecution had met its burden of demonstrating beyond a reasonable doubt that the fact that Defendant was shackled/restrained did not contribute to the

15

jury's guilty verdict. She based this finding solely on the jurors' testimony at the evidentiary hearings. *Id.,* at pp 2-3.

**Post-Remand Direct Appellate Review in the State Court**

Petitioner timely appealed the trial court's opinion by right to the Michigan Court of Appeals. In an opinion dated December 13, 2012 the Michigan Court of Appeals acknowledged that five jurors testified on remand that they saw Petitioner shackled at some point during the proceedings, and that some jurors remembered minor comments about the jurors. *People v. Davenport,* unpublished, CA #306868, 12/13/2012, slip op, pp 1-2. The Michigan Court of Appeals, however, found that the "trial court properly found that the prosecution met its burden of proving beyond a reasonable doubt that the error did not affect the jury's verdict." *Id.* at p 2. The Court of Appeals based this finding on the jurors' testimony on remand that "defendant's shackles were not discussed during jury deliberations and that the verdict was based solely on the evidence presented at trial. The five jurors who observed defendant's shackles each testified that they believed there was nothing unusual about his shackling and that it did not influence their respective verdicts. All of the evidence indicated that the shackling did not affect the verdict in any way." *Id.* at p 2.

In an order dated September 3, 2013, the Michigan Supreme Court agreed that the Michigan Court of Appeals erred, but that the error was harmless:

> "On order of the Court, the application for leave to appeal the December 13, 2012 judgment of the Court of Appeals is considered, and it is DENIED, because we are not persuaded that the question should be reviewed by this Court. While the Court of Appeals erroneously failed to consider the defendant's claim in light of the United States Supreme Court decision in *Holbrook v. Flynn,* 475 U.S. 560, 570; 106 S.Ct. 1340; 89 L.Ed.2d 525 (1986) ("the question must be not whether jurors actually articulated a consciousness of

some prejudicial effect, but rather whether 'an unacceptable risk is presented of impermissible factors coming into play'"), citing *Estelle v. Williams,* 425 U.S. 501, 505; 96 S.Ct. 1691; 48 L.Ed.2d 126 (1976), the error was harmless under the facts of this case. Given the substantial evidence of guilt presented at trial, we cannot conclude that there was an unacceptable risk of impermissible factors coming into play." *People v. Ervine Lee Davenport,* 494 Mich. 875 (2013).

Petitioner now files this Petition for Writ of Habeas Corpus.

### STANDARD OF REVIEW

Because it is being filed after April 24, 1996, this habeas petition is governed by the Antiterrorism and Effective Death Penalty Act of 1996 ("AEDPA"). *Brumley v. Wingard*, 269 F.3d 629, 637 (6th Cir. 2001).

Pursuant to AEDPA, habeas corpus relief is available with respect to claims adjudicated on the merits in state court only if the adjudication: (1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States; or (2) resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the state court proceeding. 28 U.S.C. § 2254(d)(1)-(2).

Under 28 U.S.C. § 2254(d)(1), a state court's decision is "contrary to ... clearly established Federal law," as determined by the U.S. Supreme Court, "if the state court applies a rule different from the governing law set forth in our cases, or if it decides a case differently than we have done on a set of materially indistinguishable facts." *Bell v. Cone,* 535 U.S. 685, 694, 122 S.Ct. 1843, 152 L.Ed.2d 914 (2002). A state court's decision "involve[s] an unreasonable application of[ ] clearly established Federal law" as determined by the U.S. Supreme Court, within the meaning of § 2254(d)(1), "if the state court identifies the correct governing legal rule ... but unreasonably applies it to the facts" or "if the state court either unreasonably extends a legal principle from our precedent to a new context where it should not apply or unreasonably refuses to extend that principle to a new context where it should apply." *Williams v. Taylor,* 529 U.S. 362, 407, 120 S.Ct. 1495, 146 L.Ed.2d 389 (2000).

This Court must defer to the state court's legal conclusions unless they are contrary to or unreasonably apply clearly established federal law as determined by the United States Supreme

Court. 28 U.S.C. § 2254(d)(1). This Court must defer to the state court's factual conclusions unless they are based on an unreasonable determination of the facts in light of the evidence presented in the state court proceeding. 28 U.S.C. § 2254(d)(2). When a State court determines that a constitutional violation is harmless, a federal court may not award habeas relief under § 2254 unless the harmlessness determination itself was objectively unreasonable. *Mitchell v. Esparza,* 540 U.S. 12, 124 S.Ct. 7, 157 L.Ed.2d 263 (2003).

Petitioner contends that the state court's decision is both contrary to clearly established Federal law as established by the U.S. Supreme Court in *Illinois v. Allen,* 397 U.S. 337, 90 S.Ct. 1057, 25 L.Ed.2d 353 (1970), *Holbrook v. Flynn,* 475 U.S. 560, 567, 106 S.Ct. 1340, 89 L.Ed.2d 525 (1986), and *Deck v. Missouri,* 544 U.S. 622, 629, 125 S.Ct. 2007, 161 L.Ed.2d 953 (2005), and is an unreasonable application thereof.

Petitioner fully preserved this issue under state law when he argued on direct appeal that his constitutional right to due process was violated when he was shackled during trial, where the shackles were visible and seen by five jurors and the subject of comments heard by two additional jurors, and where the prosecution failed to demonstrate beyond a reasonable doubt that the shackling error did not contribute to the verdict.  Under the standards set forth in *Williams v. Taylor, supra,* Petitioner hereby requests that this Court grant his petition for a writ of habeas corpus.

I.    **PETITIONER WAS DENIED HIS FEDERAL CONSTITUTIONAL RIGHT TO DUE PROCESS WHERE HE WAS SHACKLED DURING TRIAL, WHERE THE SHACKLES WERE VISIBLE AND SEEN BY FIVE JURORS AND THE SUBJECT OF COMMENTS HEARD BY TWO ADDITIONAL JURORS, AND WHERE THE PROSECUTION FAILED TO DEMONSTRATE BEYOND A REASONABLE DOUBT THAT THE SHACKLING ERROR DID NOT CONTRIBUTE TO THE VERDICT.**

During trial Petitioner was shackled with a belly chain, a wrist shackle on his left hand, and leg shackles. His right hand was uncuffed to allow him to write notes to defense counsel during trial. Petitioner objected to the judge's decision to shackle him, but was overruled (T I, 20-23, 113). The record reveals that the trial judge made none of the pretrial findings necessary to warrant shackling (T I, 20-23). The shackles were seen by five jurors and were the subject of comments heard by two additional jurors.

Petitioner was denied his federal constitutional right to due process where he was shackled for most of his trial,[3] where five jurors actually observed the shackles and two additional jurors heard comments from other jurors about the shackles, and where the prosecution failed to demonstrate beyond a reasonable doubt that the shackling error did not contribute to the verdict.  U.S. Const., Ams V, XIV.  Petitioner contends that the State Court's decision is both contrary to clearly established Federal law as established by the U.S. Supreme Court in *Illinois v. Allen,* 397 U.S. 337, 90 S.Ct. 1057, 25 L.Ed.2d 353 (1970), *Holbrook v. Flynn,* 475 U.S. 560, 567, 106 S.Ct. 1340, 89 L.Ed.2d 525 (1986), and *Deck v. Missouri,* 544 U.S. 622, 629, 125 S.Ct. 2007, 161 L.Ed.2d 953 (2005), and is an unreasonable application thereof.

---

[3] Petitioner was unshackled, out of the jury's presence, prior to taking the stand to testify and for the remainder of that day (T VI, 1005-1010, 1153).

Due Process at its core requires fundamental fairness. Due process prohibits the routine use of visible shackles during courtroom proceedings. "[T]he Fifth and Fourteenth Amendments prohibit the use of physical restraints visible to the jury absent a trial court determination, in the exercise of its discretion, that they are justified by a state interest specific to a particular trial." *Deck v. Missouri, supra*; U.S. Const., Ams V, XIV.  See also *Holbrook v. Flynn, supra*; *Illinois v. Allen, supra*. Inherent in the American justice system's concept of fairness in the criminal trial process is the presumption of innocence; fairness mandates that a defendant be presumed innocent until proven guilty beyond a reasonable doubt.  *In re Winship,* 397 U.S. 358, 363, 90 S.Ct. 1068, 25 L.Ed.2d 368 (1970).  Central to this right "is the principle that 'one accused of a crime is entitled to have his guilt or innocence determined solely on the basis of the evidence introduced at trial, and not on grounds of official suspicion, indictment, continued custody, or other circumstances not adduced as proof at trial.'" *Holbrook v. Flynn,* 475 U.S. at 567, quoting *Taylor v. Kentucky,* 436 U.S. 478, 485, 98 S.Ct. 1930, 56 L.Ed.2d 468 (1978).

In *Deck v. Missouri,* the Supreme Court outlined three fundamental legal principles central to its holding that a defendant has a Due Process right to be free of shackles during the guilt and penalty phases of a trial. The first is the presumption of innocence. The Supreme Court concluded that shackling undermines that presumption, as well as the related fairness of the fact-finding process. The second is the right to counsel. The Supreme Court concluded that shackling diminishes that right and may interfere with an accused's "ability to communicate" with his lawyer and with an accused's ability to participate in his own defense.  The third is the need to maintain a dignified judicial process.  The Supreme Court concluded that shackling constitutes an "affront" to the dignity of judicial proceedings.  *Deck,* 544 U.S. at 631-634.

A. **NO JUSTIFIABLE REASONS TO SHACKLE**

Because visible shackling is such an extreme measure and is so likely to cause prejudice to a defendant, it is permitted only when justified by an essential state interest specific to each trial. *Holbrook v. Flynn,* 475 U.S. at 568-569. The United States Supreme Court announced in *Illinois v. Allen,* 397 U.S. at 344 "that even to contemplate such a technique . . . arouses a feeling that no person should be tried while shackled and gagged except as a last resort." Due process requires the trial court to engage in an analysis of the security risks posed by the defendant and to consider less restrictive alternatives before permitting a defendant to be restrained. *Deck v Missouri, supra.* 544 U.S. at 626-630. *Deck* recognizes the legitimacy of security concerns, but the concerns cannot be generalized. They must exist in the particular case, apply specifically to the defendant on trial in that case, and be articulated on the record. *Deck,* 544 U.S. at 629-630.

In 2010, a panel of the Michigan Court of Appeals in Petitioner's appeal of right correctly found that the State Circuit Court "failed to make any findings on the record -- let alone findings that were supported by record evidence that warranted such an extreme precaution." *People v Ervine Lee Davenport,* unpublished, CA 287767, 8/5/10.

The Michigan Supreme Court then subsequently ruled in Petitioner's case that: 1) defense counsel adequately preserved this issue at trial; 2) that Petitioner was entitled to an evidentiary hearing to develop the record "of whether his shackling during trial prejudiced his defense"; and 3) that "[i]f it is determined that the jury saw the defendant's shackles, the circuit court shall determine whether the prosecution can demonstrate beyond a reasonable doubt that the shackling error did not contribute to the verdict against the defendant." *People v. Ervine Lee Davenport,* 488 Mich. 1054 (2011).

B.   **PETITIONER HAS ESTABLISHED A RECORD THAT THE SHACKLES WERE VISIBLE TO FIVE JURORS, THAT TWO ADDITIONAL JURORS WERE AWARE OF COMMENTS ABOUT THE SHACKLES, AND ONE OF THESE TWO ALSO NOTICED PETITIONER'S LIMITED MOVEMENT.**

At the evidentiary hearings held on remand in the State Circuit Court, Petitioner established that the shackles were visible and actually seen by five of the jurors during trial. Some of these jurors observed the shackles during voir dire, others observed them and/or discussed them throughout this eight day trial, and some had discussions or made comments about the shackles as late as the sixth day of trial when Petitioner took the witness stand.  Some of these jurors saw the handcuffs, some observed the belly chain, and some observed the leg/foot shackles. See Rooseboom (EHT 6/24/11, 14-15); Jankord (EHT 6/24/11, 36-37, 40-42); Lewis (EHT 6/24/11, 48-49); Vanderveen (EHT 6/24/11, 81-84, 86, 88); and Whately (EHT 6/24/11, 99-102, 104); see also Statement of Facts, *supra,* for detailed summary of the extent of the jurors' observations.  Another juror (Padgett) did not see the restraints, but heard 2-3 comments from other jurors about the restraints (EHT 6/24/11, 59-62, 72-73). Another juror (Kucera) did not see the restraints, but noticed that Petitioner had limited movement and could only write with one hand during trial; he also heard one comment from another juror in the hallway about the restraints (EHT 7/29/11, 17, 19).

In a written opinion dated October 20, 2011, Circuit Court Judge Lightvoet correctly found that, "There is no question that, despite the precautions taken, many of the jurors were able to observe Defendant's shackles/restraints during the trial. This is clear from the testimony of the jurors and not disputed in the parties' briefs." See Judge Lightvoet's Opinion After Remand From the Michigan Supreme Court dated 10/20/11, p 2. However, Judge Lightvoet found any error to be harmless based on the jurors' testimony at the evidentiary hearing.

23

Petitioner appealed the State Circuit Court's opinion by right to the Michigan Court of Appeals. In an opinion dated December 13, 2012 the Michigan Court of Appeals acknowledged that five jurors testified on remand that they saw Petitioner shackled at some point during the proceedings, and that some jurors remembered minor comments about the jurors. *People v. Davenport,* unpublished, CA #306868, 12/13/2012, slip op, pp 1-2.

> C. **UNDER THE PROPER *DECK* ANALYSIS, THE PROSECUTION FAILED TO DEMONSTRATE BEYOND A REASONABLE DOUBT THAT THE SHACKLING ERROR DID NOT CONTRIBUTE TO THE VERDICT.**

*Deck* clearly places the burden on the State to prove beyond a reasonable doubt that the shackling error did not contribute to the verdict:

> "Thus, where a court, without adequate justification, orders the defendant to wear shackles that will be seen by the jury, the defendant need not demonstrate actual prejudice to make out a due process violation. The State must prove 'beyond a reasonable doubt that the [shackling] error complained did not contribute to the verdict obtained.' *Chapman v California,* 386 US 18, 24, 87 S Ct 824, 17 L Ed 2d 705 (1967)." *Deck,* 544 U.S. at 635.

The Supreme Court in *Deck* also made it clear that shackling is "inherently prejudicial," that it inevitably undermines the jury's ability to accurately weigh the relevant considerations, and that the practice has negative effects that are unquantifiable and elusive:

> "The appearance of the offender during the penalty phase in shackles, however, almost inevitably implies to a jury, as a matter of common sense, that court authorities consider the offender a danger to the community—often a statutory aggravator and nearly always a relevant factor in jury decisionmaking, even where the State does not specifically argue the point. Cf. Brief for Respondent 25–27. It also almost inevitably affects adversely the jury's perception of the character of the defendant. See *Zant v. Stephens,* 462 U.S. 862, 900, 103 S.Ct. 2733, 77 L.Ed.2d 235 (1983) (REHNQUIST, J., concurring in judgment) (character and propensities of the defendant are part of a "unique, individualized judgment regarding the punishment that a particular person deserves"). And it thereby

inevitably undermines the jury's ability to weigh accurately all relevant considerations—considerations that are often unquantifiable and elusive—when it determines whether a defendant deserves death. In these ways, the use of shackles can be a "thumb [on] death's side of the scale." *Sochor v. Florida,* 504 U.S. 527, 532, 112 S.Ct. 2114, 119 L.Ed.2d 326 (1992) (internal quotation marks omitted); see also *Riggins,* 504 U.S., at 142, 112 S.Ct. 1810 (KENNEDY, J., concurring in judgment) (through control of a defendant's appearance, the State can exert a "powerful influence on the outcome of the trial")." *Deck,* 544 US at 632-633.

***

"The third argument [that the defendant suffered no prejudice] fails to take account of this Court's statement in *Holbrook* that shackling is "inherently prejudicial." 475 U.S., at 568, 106 S.Ct. 1340. That statement is rooted in our belief that the practice will often have negative effects, but—like "the consequences of compelling a defendant to wear prison clothing" or of forcing him to stand trial while medicated—those effects "cannot be shown from a trial transcript." *Riggins, supra,* at 137, 112 S.Ct. 1810. Thus, where a court, without adequate justification, orders the defendant to wear shackles that will be seen by the jury, the defendant need not demonstrate actual prejudice to make out a due process violation. The State must prove "beyond a reasonable doubt that the [shackling] error complained of did not contribute to the verdict obtained." *Chapman v. California,* 386 U.S. 18, 24, 87 S.Ct. 824, 17 L.Ed.2d 705 (1967)." *Deck,* 544 U.S. at 635.

In Petitioner's case, the Michigan Court of Appeals found the shackling issue harmless and affirmed Petitioner's conviction. *People v. Ervine Lee Davenport,* unpublished opinion per curiam of the Michigan Court of Appeals, issued December 13, 2012 (No. 306868). The Michigan Court of Appeals acknowledged that five jurors testified on remand that they saw Mr. Davenport shackled at some point during the proceedings, and that some jurors remembered minor comments about the jurors. The Court of Appeals, however, found that the "trial court properly found that the prosecution met its burden of proving beyond a reasonable doubt that the error did not affect the jury's verdict." *Id.*  The Court of Appeals based this finding on the jurors' testimony on remand that "defendant's shackles were not discussed during jury deliberations and

that the verdict was based solely on the evidence presented at trial.  The five jurors who observed defendant's shackles each testified that they believed there was nothing unusual about his shackling and that it did not influence their respective verdicts. All of the evidence indicated that the shackling did not affect the verdict in any way." *Id.*

In an order dated September 3, 2013, the Michigan Supreme Court agreed with Petitioner that the Michigan Court of Appeals erred in relying on the jurors' assessment of prejudice, but the Michigan Supreme Court summarily found that the error was harmless:

> "On order of the Court, the application for leave to appeal the December 13, 2012 judgment of the Court of Appeals is considered, and it is DENIED, because we are not persuaded that the question should be reviewed by this Court. While the Court of Appeals erroneously failed to consider the defendant's claim in light of the United States Supreme Court decision in *Holbrook v. Flynn,* 475 U.S. 560, 570; 106 S.Ct. 1340; 89 L.Ed.2d 525 (1986) ("the question must be not whether jurors actually articulated a consciousness of some prejudicial effect, but rather whether 'an unacceptable risk is presented of impermissible factors coming into play'"), citing *Estelle v. Williams,* 425 U.S. 501, 505; 96 S.Ct. 1691; 48 L.Ed.2d 126 (1976), the error was harmless under the facts of this case. Given the substantial evidence of guilt presented at trial, we cannot conclude that there was an unacceptable risk of impermissible factors coming into play." *People v.  Ervine Lee Davenport,* 494 Mich. 875 (2013).

Petitioner submits that the Michigan Supreme Court's summary determination of harmlessness "on the facts of this case" allows this Court to proceed with an independent review of the claim "through the lens of § 2254(d)." *Price v. Vincent,* 538 U.S. 634, 639, 123 S.Ct. 1848, 155 L.Ed.2d 877 (2003). See also *Lakin v. Stine,* 431 F.3d 959, 963 (6th Cir. 2005).  In addition, Petitioner submits that the Michigan Supreme Court's harmlessness determination itself was objectively unreasonable.

In the instant case, the shackling of Petitioner was extensive,[4] and the shackles were actually seen and commented on by the jurors throughout trial. The shackling clearly undermined the presumption of innocence, as well as the related fairness of the fact-finding process, and was an affront to the dignity of the judicial proceedings. The prosecution has the burden to demonstrate beyond a reasonable doubt that the shackling error did not contribute to the verdict against Petitioner. *Deck,* 544 U.S. at 635.

Petitioner was charged with first-degree murder. At trial, he claimed self-defense. Petitioner testified that Annette White (the deceased) had a propensity for violence (T VI, 1014-1018).  On January 12, 2007, he and Ms. White were drinking beer and smoking crack (T VI, 1023-1031). Dr. Hunter confirmed that at the time of her death, there was a sizeable dose of parent cocaine in her system and she had a blood alcohol level of .12.  The cocaine was used close to the time of her death (T II, 410-413). While Petitioner was driving her home, she became agitated and combative; she threatened him with a box cutter and she swung it into his right arm. Petitioner testified at trial that he grabbed her and pushed her back, pinning her against the passenger side of the vehicle, but denied that he intended to hurt her (T VI, 1023-1046).

The pathologist who performed an autopsy on the victim testified on rebuttal that the victim's neck injury appeared inconsistent "with a broad force placed across" the victim's neck, and was consistent with "choking" (T VII, 1193-1194). The prosecutor presented evidence during trial that Petitioner had a propensity for violence, including a prior instance of allegedly choking Leslie Snook (T III, 712-726).

---

[4] See *Spain v. Rushen,* 883 F.2d 712,722 (9th Cir. 1989), where the Ninth Circuit held that "the greater the intensity of shackling and the chains' visibility to the jurors, the greater the extent of prejudice."; *Larson v. Palmateer,* 515 F.3d 1057, 1064 (9th Cir. 2008), "[P]hysical restraints such as a waist chain, leg irons or handcuffs may create a more prejudicial appearance than more unobtrusive forms of restraint."

During closing argument, the prosecutor repeatedly maintained that Petitioner's claim of self-defense was "absolutely bogus" and a bunch of lies (T VII, 1203-1204, 1207-1210, 1253-1254, 1258, 1262). Both attorneys admitted that the instant case was a credibility battle (T VII, 1217-1218, 1241-1243, 1253-1254, 1258, 1262).

Petitioner's case is remarkably similar to *Rhoden v. Rowland,* 172 F.3d 633 (9th Cir. 1999), where the Ninth Circuit granted habeas relief.  The Ninth Circuit initially remanded to determine whether the jurors observed the shackles and whether it was so inherently prejudicial that it threatened the fairness of the trial.  At the evidentiary hearing in *Rhoden,* five jurors testified that they saw the restraints and that the issue of shackling was not mentioned during deliberations. *Rhoden,* 172 F.3d at 635-636. The magistrate judge found that the shackles were visible, but "made little actual impression on them." *Id.*  Therefore, the magistrate found that Rhoden was not inherently prejudiced. *Id.*  The District Court adopted the magistrate's report. *Id.* The Ninth Circuit, however, put absolutely no stock in the jurors' testimony that the shackling was not mentioned during deliberations, or the finding by the magistrate and District Court that the shackles made little actual impression on the jurors. Rather, the Ninth Circuit addressed harmless error as follows:

> "Due process was denied when the trial court ordered Rhoden shackled during his trial without a proper determination of the need for shackles. See *Holbrook,* 475 U.S. at 568-69, 106 S.Ct. 1340. In *Rhoden I,* we remanded for the district court to determine what the jury saw. *Rhoden I,* 10 F.3d at 1460. The district court found that several of the jurors actually saw the shackles during the trial. Indeed, the jurors remembered the shackles even though the hearing was six years after the trial. At least two jurors remember other jurors making comments to them about the shackles. Moreover, evidence indicates that the shackles caused Rhoden physical and emotional pain during his trial. Thus, there is a strong likelihood of prejudice here. See *Holbrook,* 475 U.S. at 568, 106 S.Ct. 1340; *Spain,* 883 F.2d. at 721; *Elledge,* 823 F.2d at 1451.

Furthermore, Rhoden was charged with violent crimes and the basic issue at his trial concerned whether there was consent or whether Rhoden used force or fear to overcome his accuser's will. The evidence on this issue was disputed and the jurors deliberated for over nine hours over three days, which suggests that they did not find the case to be clear-cut, *Gibson v. Clanon,* 633 F.2d 851, 855 n. 8 (9th Cir.1980). **Because at least some of the jurors saw the shackles and because the shackles essentially branded Rhoden as having a violent nature in a case where his propensity for violence was the crucial issue, the shackles "had substantial and injurious effect or influence in determining the jury's verdict" and thus did not constitute harmless error.** *Brecht v. Abrahamson,* 507 U.S. 619, 637, 113 S.Ct. 1710, 123 L.Ed.2d 353; *Calderon v. Coleman,* 525 U.S. 141, 119 S.Ct. 500, 503, --- L.Ed.2d ---- (1998); *Castillo,* 997 F.2d at 669; *Duckett,* 67 F.3d at 749.

The judgment of dismissal is REVERSED and the matter is REMANDED with instructions to grant the petition." *Rhoden,* 172 F3d at 637-638 (emphasis added).

Likewise, in Petitioner Davenport's case, the extensive shackles essentially branded him as having a violent nature in a case where his propensity for violence was the crucial issue in this murder trial where Petitioner claimed self-defense. Petitioner was entitled to the indicia of innocence throughout his trial. In the presence of the jury, he was entitled to be relieved of the shackles, so as not to mark him as an obviously violent and dangerous man or to suggest that the fact of his guilt was a foregone conclusion. Instead, Petitioner was clothed in chains; he was completely shackled from his waist to his feet – his left hand was shackled to a belly chain, and his legs were shackled. The jurors remembered seeing the shackles even though the evidentiary hearing was held three years after the trial. The jurors also remembered the comments/discussions that were made about the shackles throughout trial.

Three jurors testified on remand that they believed Petitioner was dangerous. Juror Jankord opined that the purpose of the shackling and the deputies in the courtroom was for security; he "absolutely" thought that Petitioner might be dangerous (EHT 6/24/11, 43). He

added that he presumed he was dangerous because of the nature of the case (EHT 6/24/11, 45).

Juror Vanderveen acknowledged that there were 2-3 deputies in the courtroom during trial; when

he saw the restraints, he assumed that Petitioner might be dangerous (EHT 6/24/11, 89).   He

wasn't fearful but he felt safer knowing that Petitioner was charged with murder one and that he

was shackled (EHT 6/24/11, 90). Juror Whately noticed that Petitioner "is a big guy" (EHT

6/24/11, 98). Mr. Whately observed the foot shackles and the handcuffs (EHT 6/24/11, 99-104).

Mr. Whately recalled that there were at least three deputies if not more in the courtroom during

the trial; he thought there was a deputy that was standing next to Petitioner when he testified, but

he could not "remember for sure" (EHT 6/24/11, 105).   Based on the murder charge, Mr.

Whately thought Petitioner "could be dangerous, but I didn't think he would do something in

here." (EHT 6/24/11, 106).  In addition, Juror Padgett explained that her seat in the jury box was

in the front row at the end.  She felt nervous when one of the shackled witnesses testified, but

there was a deputy standing right there (EHT 6/24/11, 63-66). Ms. Padgett also testified that

when Petitioner testified, "they were sure --  there were more guards because he wasn't

[restrained]." (EHT 6/24/11, 68). Because she was probably the closest to Petitioner when he

testified, the other juror asked if that made her nervous (EHT 6/24/11, 68-69).

At trial, the prosecution presented evidence that Petitioner disposed of the body,

attempted to get rid of the shoes he wore, stole items from the victim's apartment and sold them.

After Petitioner testified that he acted in self-defense, the prosecution called Dr. Hunter as a

rebuttal witness; he testified that it would take several minutes of applying pressure to strangle

someone.

Petitioner submits that the first three factors cited above are post-incident factors that are

equally indicative of panic after the incident. Although Dr. Hunter's testimony was damaging,

Petitioner maintains that even if the jury reasonably believed his testimony, they still might not have concluded that Petitioner was guilty of first-degree murder. The question whether Petitioner's use of force would be first-degree murder, second-degree murder or manslaughter was an issue for the jury. The shackling undermined the jury's ability to impartially examine Petitioner's credibility.  Petitioner testified and gave an account of the altercation that conflicted with Dr. Hunter's testimony.

At the time of trial, Petitioner was a 43-year-old African-American male who was 6' 5" tall and weighed 270 pounds.[5]  The shackling of Petitioner throughout trial confirmed the Prosecution's theory of Petitioner's conduct, thereby lending additional credibility to the Prosecution's case. The jurors may have been less willing to believe Petitioner.  From the very beginning of this trial, the visible shackles stripped Petitioner of his presumption of innocence, of his right to a fair and impartial jury, undermined the fairness of the fact-finding process, and were an affront to the dignity of the trial.  U.S. Const., Ams VI, XIV.  Four of the five jurors testified that they observed the shackles during voir dire (EHT 6/24/11, 14, 36, 81, 99-100). From the very beginning of this trial, these four jurors were inherently influenced by the shackles and invited to perceive Petitioner as a dangerous man who the Court had deemed required shackling in this first-degree murder case.  From the very beginning of this trial, these jurors were unable to view the evidence impartially.  The shackling of Petitioner relates to factual questions that went to the heart of the jury's role in this case:  to weigh the relative credibility of witnesses in a case that turned almost entirely on whether the jury found Petitioner's version of events to be credible. The jury's duty to resolve these factual questions was severely impaired when it observed Petitioner in shackles, which besmirched Petitioner's character.

---

[5] See Basic Information Sheet of Presentence Investigation Report.

The jury deliberated for about six hours over the course of two days, which suggests they did not find the case to be clear cut. Because five of the jurors actually saw the shackles and two additional jurors either heard comments about the shackles or noticed Petitioner's limited movement, and because the shackles clearly branded Petitioner as having a violent nature in a case where his propensity for violence was the crucial issue, the prosecution did not demonstrate beyond a reasonable doubt that the shackling error did not contribute to the verdict against Petitioner. The extensive shackling of Petitioner in this case marked him as a violent and dangerous man. Without uttering a word or making a gesture, he stood virtually convicted before the jury at the very beginning of this trial. His absolute right to the presumption of innocence was not just diminished, but rather it was obliterated. The shackles destroyed Petitioner's credibility and his claim of self-defense in this context. The shackles were a constant reminder that the State Circuit Court Judge had deemed Petitioner, a large African-American male, to be so dangerous that he required shackles. This extensive shackling "had substantial and injurious effect or influence in determining the jury's verdict" and thus did not constitute harmless error. *Brecht v. Abrahamson,* 507 U.S. 619, 637, 113 S.Ct. 1710, 123 L.Ed.2d 353 (1993).   The Michigan Supreme Court's harmlessness determination itself was objectively unreasonable in this case.

Furthermore, the State appellate court should not have invaded the province of the jury in determining whether the shackles were harmless. Petitioner has a constitutional right to a trial by an impartial jury, to have the jury weigh the evidence and make credibility determinations, and to have the jury determine whether he is guilty. U.S. Const., Ams VI, XIV; *Sullivan v. Louisiana,* 508 U.S. 275, 277, 113 S.Ct. 2078, 124 L.Ed.2d 182 (1993). The appellate court should not make its own credibility determinations with regard to Petitioner's self-defense claim. As the Sixth Circuit made clear in *Barker v. Yukins,* 199 F.3d 867, 874-875 (6th Cir.  1999), "It is neither the

proper role for a state supreme court, nor for this Court, to stand in the place of the jury, weighing competing evidence and deciding that some evidence is more believable than others." *Id.* at 874.  The verdict in this case necessarily required the jurors to believe the prosecution witnesses and to disbelieve Petitioner. The jury's assessment of Petitioner's credibility may have been affected by the clear suggestion that Petitioner posed such a security problem that a belly chain, wrist shackles and leg shackles were needed throughout trial. Because the shackling error may have tipped the balance, the prosecution cannot demonstrate beyond a reasonable doubt that the shackling error did not contribute to the verdict against Petitioner.  He is entitled to have his conviction reversed and to receive a new trial.

Finally, the orange jail uniform worn by Petitioner only during the morning session of the first day of trial does not render the error harmless.[6] At the evidentiary hearings the prosecutor questioned the jurors about whether they noticed Petitioner's attire at trial. Most of the jurors (seven) noticed that Petitioner was wearing an orange jail uniform at the beginning of the trial (EHT 6/24/11, 14-15, 27, 36, 59, 81, 91, 98). Jurors Lewis, Ruzick, Engster, Weishar, and Kucera did not recall seeing the orange jail uniform.

The orange jail uniform does not render the shackling error harmless.  The jail uniform made it clear that Petitioner was incarcerated at the time of trial; however, the wrist shackle, the belly chain, and the leg shackles on Petitioner were far more damaging and prejudicial, as the shackles made it clear that Petitioner was dangerous, and a bad man with such a propensity for violence that the multiple sheriff deputies in the courtroom could not handle him without the full complement of shackles. Petitioner submits that the jail uniform actually compounded the

---

[6] After several delays of the trial date over an 18 month period, Petitioner did not believe trial was going to commence.  However, once he determined that trial was actually going to start, defense counsel made a timely objection to the jail clothing and she twice requested that Petitioner be allowed to change into his civilian clothes prior to voir dire (T I, 19-24).

shackling error, as it reinforced Petitioner's status.  Shackles inherently signify a need to restrain someone because the Court has deemed them dangerous and that they have a propensity for violence. Such an implication is more prejudicial than a mere understanding that someone is in jail pending a trial. See *Estelle v. Williams,* 425 U.S. 501, 96 S.Ct. 1691, 48 L.Ed.2d 126 (1976).

The state court's decision in Petitioner's case is both contrary to clearly established Federal law as established by the U.S. Supreme Court, and an unreasonable application thereof. Furthermore, the Michigan Supreme Court's harmlessness determination itself was objectively unreasonable. This Court should grant this Petition for Writ of Habeas Corpus.

## SUMMARY AND RELIEF REQUESTED

For these reasons, Petitioner Davenport asks that this Court grant the petition for habeas corpus.

Respectfully submitted,

**STATE APPELLATE DEFENDER OFFICE**

BY:   s/ Valerie R. Newman
      **VALERIE R. NEWMAN (P47291)**
      Assistant Defender
      645 Griswold, Suite 3300
      Detroit, Michigan  48226
      vnewman@sado.org
      (313) 256-9833

Dated:  September 25, 2014

## CERTIFICATE OF SERVICE

I hereby certify that on September 25, 2014, I electronically filed the foregoing paper with the Clerk of the Court using the ECF system and have mailed a hard copy by U.S. Postal Service to the following:

> Michigan Attorney General,
> Criminal Appellate Division
> 525 West Ottawa
> P O Box 30217
> Lansing, MI 48909

BY:    <u>s/ Valerie R. Newman</u>
**VALERIE R. NEWMAN (P47291)**
Assistant Defender
645 Griswold, Suite 3300
Detroit, Michigan  48226
vnewman@sado.org
(313) 256-9833