UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

ERVINE DAVENPORT #179762,

    Petitioner,

v.

DUNCAN MACLAREN,

    Respondent.
_____/

Hon. Janet T. Neff

Case No. 1:14-CV-1012

**REPORT AND RECOMMENDATION**

This matter is before the Court on Davenport's petition for writ of habeas corpus. In accordance with 28 U.S.C. § 636(b) authorizing United States Magistrate Judges to submit proposed findings of fact and recommendations for disposition of prisoner petitions, the undersigned recommends that Davenport's petition be **denied**.

**BACKGROUND**

As a result of events occurring on or about January 13, 2007, Petitioner was charged with homicide, open murder. (ECF No. 8-7 at PageID.583). Following a jury trial, Petitioner was convicted of first degree murder. (ECF No. 8-20 at PageID.2030). Petitioner was sentenced to serve life in prison without possibility of parole. (ECF No. 8-21 at PageID.2047). Petitioner appealed his conviction to the Michigan Court of Appeals asserting the following claims:

    I.    Defendant was denied his state and federal constitutional right to due process where his left hand

1

>   was shackled to his waist for most of the trial; defense counsel was ineffective for failing to lodge a clear objection to the court's policy of shackling.[1]
>
> II.    Defendant's conviction must be vacated and the charge dismissed with prejudice based on the violation of his constitutional right to speedy trial.
>
> III.   Defendant's conviction for first-degree murder must be reversed where there was insufficient evidence of premeditation and deliberation.

The Michigan Court of Appeals affirmed Petitioner's conviction. *People v. Davenport*, 2010 WL 3062279 (Mich. Ct. App., Aug. 5, 2010). The Michigan Supreme Court, however, reversed the determination that Petitioner was not entitled to an evidentiary hearing. *People v. Davenport*, 794 N.W.2d 616 (Mich. 2011). Specifically, the court held that Petitioner "should have been permitted to develop the record on the issue of whether his shackling during trial prejudiced his defense." *Id.* The court further held that "if it is determined that the jury saw the defendant's shackles, the circuit court shall determine whether the prosecution can demonstrate beyond a reasonable doubt that the shackling error did not contribute to the verdict against the defendant." *Id.*

Following an evidentiary hearing in which all twelve jurors testified, the trial court concluded that "despite the precautions taken, many of the jurors were able to observe Defendant's shackles/restraints during the trial." (ECF No. 8-27 at PageID.2631). The court further determined, however, that the prosecution had "demonstrated beyond a reasonable doubt that the fact that Defendant was shackled/restrained did not contribute to the jury's guilty verdict." (ECF No. 8-27

---

[1] Petitioner also separately requested that the matter be remanded for an evidentiary hearing on the shackling issue.

at PageID.2631).  Petitioner appealed the matter to the Michigan Court of Appeals asserting the following claim:

> I. Defendant was denied his state and federal constitutional right to due process where he was shackled during trial, where the shackles were visible and seen by five jurors and the subject of comments heard by two additional jurors, and where the prosecution cannot demonstrate beyond a reasonable doubt that the shackling error did not contribute to the verdict.

The Michigan Court of Appeals affirmed Petitioner's conviction on the ground that "[t]he trial court did not err in finding that the prosecution proved beyond a reasonable doubt that the shackling error did not affect the verdict." *People v. Davenport*, 2012 WL 6217134 (Mi. Ct. App., Dec. 13, 2012).  Petitioner unsuccessfully moved in the Michigan Supreme Court for leave to appeal this determination. *People v. Davenport*, 632 N.W.2d 389 (Mich. 2013).  On September 25, 2014, Petitioner initiated the present action, asserting the claim identified immediately above.

## STANDARD OF REVIEW

Davenport's petition is subject to the provisions of the Antiterrorism and Effective Death Penalty Act (AEDPA), as it amended 28 U.S.C. § 2254.  The AEDPA amended the substantive standards for granting habeas relief under the following provisions:

> (d) An application for a writ of habeas corpus on behalf of a person in custody pursuant to the judgment of a State court shall not be granted with respect to any claim that was adjudicated on the merits in State court proceedings unless the adjudication of the claim —
>
> > (1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of

>   the United States, or
>
> (2)  resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding.

28 U.S.C. § 2254(d).

The AEDPA has "modified" the role of the federal courts in habeas proceedings to "prevent federal habeas 'retrials' and to ensure that state-court convictions are given effect to the extent possible under law." *Bell v. Cone*, 535 U.S. 685, 693 (2002).

Pursuant to § 2254(d)(1), a decision is "contrary to" clearly established federal law when "the state court arrives at a conclusion opposite to that reached by [the Supreme] Court on a question of law" or "if the state court confronts facts that are materially indistinguishable from a relevant Supreme Court precedent and arrives at an opposite result." *Ayers v. Hudson*, 623 F.3d 301, 307 (6th Cir. 2010) (quoting *Williams v. Taylor*, 529 U.S. 362, 405 (2000)).

Prior to *Williams*, the Sixth Circuit interpreted the "unreasonable application" clause of § 2254(d)(1) as precluding habeas relief unless the state court's decision was "so clearly incorrect that it would not be debatable among reasonable jurists." *Gordon v. Kelly*, 2000 WL 145144 at *4 (6th Cir., February 1, 2000); *see also*, *Blanton v. Elo*, 186 F.3d 712, 714-15 (6th Cir. 1999). The *Williams* Court rejected this standard, indicating that it improperly transformed the "unreasonable application" examination into a subjective inquiry turning on whether "at least one of the Nation's jurists has applied the relevant federal law in the same manner" as did the state court. *Williams*, 529 U.S. at 409.

In articulating the proper standard, the Court held that a writ may not issue simply because the reviewing court "concludes in its independent judgment that the relevant state-court

4

decision applied clearly established federal law erroneously or incorrectly." *Williams,* 529 U.S. at 411. Rather, the Court must also find the state court's application thereof to be *objectively* unreasonable. *Bell*, 535 U.S. at 694; *Williams*, 529 U.S. at 409-12. Accordingly, a state court unreasonably applies clearly established federal law if it "identifies the correct governing legal principle from the Supreme Court's decisions but unreasonably applies that principle to the facts of the prisoner's case" or if it "either unreasonably extends or unreasonably refuses to extend a legal principle from the Supreme Court precedent to a new context." *Ayers*, 623 F.3d at 307. Furthermore, review under § 2254(d)(1) "is limited to the record that was before the state court that adjudicated the claim on the merits." *Cullen v. Pinholster*, 563 U.S. 170, 181 (2011).

Pursuant to 28 U.S.C. § 2254(d)(2), when reviewing whether the decision of the state court was based on an unreasonable determination of the facts in light of the evidence presented, the "factual determination by [the] state courts are presumed correct absent clear and convincing evidence to the contrary." *Ayers*, 623 F.3d at 308. Accordingly, a decision "adjudicated on the merits in a state court and based on a factual determination will not be overturned on factual grounds unless objectively unreasonable in light of the evidence presented in the state-court proceeding." While this standard is "demanding" it is "not insatiable." *Id.*

For a writ to issue pursuant to § 2254(d)(1), the Court must find a violation of clearly established federal law "as set forth by the Supreme Court at the time the state court rendered its decision." *Stewart v. Irwin*, 503 F.3d 488, 493 (6th Cir. 2007). This definition of "clearly established federal law" includes "only the holdings of the Supreme Court, rather than its dicta." *Bailey v. Mitchell*, 271 F.3d 652, 655 (6th Cir. 2001). Nevertheless, "the decisions of lower federal courts may be instructive in assessing the reasonableness of a state court's resolution of an issue."

*Stewart*, 503 F.3d at 493.

As previously noted, § 2254(d) provides that habeas relief "shall not be granted with respect to any claim that was adjudicated on the merits" unless the petitioner can satisfy the requirements of either § 2254(d)(1) or § 2254(d)(2). This provision, however, "does not require a state court to give reasons before its decision can be deemed to have been 'adjudicated on the merits.'" *Harrington v. Richter*, 131 S.Ct. 770, 785 (2011). Instead, when a federal claim has been presented to a state court and the state court has denied relief, "it may be presumed that the state court adjudicated the claim on the merits." *Id.* at 784-85. Where such is the case, the Court must apply the deferential standard of review articulated above, rather than some other less deferential standard. The presumption that the state court "adjudicated [a] claim on the merits" may be overcome only "when there is reason to think some other explanation for the state court's decision is more likely." *Id.* If this presumption is overcome, however, the Court reviews the matter de novo. *See Wiggins v. Smith*, 539 U.S. 510, 533-35 (2003) (reviewing habeas issue *de novo* where state courts had not reached the question); *see also, Maples v. Stegall*, 340 F.3d 433, 437 (6th Cir. 2003) (recognizing that *Wiggins* established *de novo* standard of review for any claim that was not addressed by the state courts).

## ANALYSIS

In 1998, Carman Deck was tried by the State of Missouri for murder and robbery. *Deck v. Missouri*, 544 U.S. 622, 624 (2005). During his trial, Deck was restrained by leg braces that were apparently not visible to the jury. *Id.* Deck was convicted and sentenced to death. *Id.* at 625. On appeal, Deck's conviction was affirmed, but his sentence set aside. A new sentencing

proceeding was subsequently conducted, during which Deck "was shackled with leg irons, handcuffs, and a belly chain." Deck's objections to these restraints were rejected by the trial court. On appeal, Deck argued that his shackling violated his rights under both state and federal law. *Id.* Deck's appeals were unsuccessful, after which time he sought review by the United States Supreme Court. *Id.* at 625-26. The Court granted certiorari to "consider whether shackling a convicted offender during the penalty phase of a capital case violates the Federal Constitution." *Id.* at 624-26.

Before addressing the specific issue raised by Deck's appeal, the Court first considered "whether, as a general matter, the Constitution permits a State to use visible shackles routinely in the guilt phase of a criminal trial." *Id.* at 626. The Court concluded that "the Fifth and Fourteenth Amendments prohibit the use of physical restraints visible to the jury absent a trial court determination, in the exercise of its discretion, that they are justified by a state interest specific to a particular trial." *Id.* at 626-29. The Court concluded:

> Thus, where a court, without adequate justification, orders the defendant to wear shackles that will be seen by the jury, the defendant need not demonstrate actual prejudice to make out a due process violation. The State must prove 'beyond a reasonable doubt that the [shackling] error complained of did not contribute to the verdict obtained.'

*Id.* at 635.

Petitioner was shackled during his trial. Prior to approving this action, the trial court failed to place on the record any justification for such or provide any indication of the factors or considerations that were considered in support of this decision. Moreover, in its post-remand Opinion and Order, the trial court again offered no rationalization or justification for shackling Petitioner during his trial. Several jurors later testified that they observed Petitioner's shackles. Because the trial court did not articulate "adequate justification" for its decision, Petitioner was not

obligated to establish that he suffered prejudice as a result of being shackled in a manner that the jury observed. Instead, the burden shifted to the prosecution to establish, beyond a reasonable doubt, that shackling Petitioner "did not contribute to" the jury's guilty verdict.[2] The trial court found that the prosecution satisfied its burden, a decision which was affirmed on appeal. As discussed below, the Court concludes that given the overwhelming evidence of Petitioner's guilt, as well as the lack of evidence that the jurors were influenced by Petitioner being in shackles, Petitioner is not entitled to habeas relief.

        A.        Trial Testimony

Petitioner testified that at approximately 2:00 a.m. on January 13, 2007, he was driving when he encountered Annette White. (ECF No. 8-18 at Page ID.1742-43). White got into the car and the pair went to a nearby residence where they began using drugs. (ECF No. 8-18 at Page ID.1743-46). According to Petitioner, White's mood changed after she began using drugs. (ECF No. 8-18 at Page ID.1747-48). Specifically, she began "running the house acting a fool, you know, clowning." (ECF No. 8-18 at Page ID.1748). White later began arguing with the couple that owned the residence at which point Petitioner and White departed. (ECF No. 8-18 at Page ID.1746-50).

Petitioner began to drive White home, but when White realized where Petitioner was

---

[2] Respondent asserts that the trial court adequately justified its decision to shackle Petitioner by making reference at the subsequent evidentiary hearing to an off-the-record conversation regarding threatening statements Petitioner allegedly made as well as vague concerns about Petitioner's "large size." The Court need not concern itself whether such observations are legally sufficient, as courts have rejected such after-the-fact justifications. *See, e.g., Larson v. Palmateer*, 515 F.3d 1057, 1063 (9th Cir. 2008) ("[a]lthough any of these reasons may have provided an adequate basis for imposing security restraints, the Supreme Court in *Deck* specifically rejected such post-hoc rationales").

going she requested that he instead drive her to a different location where she could obtain more drugs. (ECF No. 8-18 at Page ID.1756-58). When Petitioner refused, White "tried to grab the wheel and turn the car." (ECF No. 8-18 at Page ID.1758). In response, Petitioner "pushed her back from the wheel." (ECF No. 8-18 at Page ID.1758). White responded by brandishing a box cutter which she swung at Petitioner cutting his upper arm. (ECF No. 8-18 at Page ID.1758-64). Petitioner immediately "grabbed" White and "pushed her over towards the other side of the car." (ECF No. 8-18 at Page ID.1764). According to Petitioner, he never placed his hands around White's neck, but instead was simply "holding her" with his hand "right up under her chin." (ECF No. 8-18 at Page ID.1764-65). White responded by "kicking and trying to reach at" Petitioner. (ECF No. 8-18 at Page ID.1765-66). White quickly dropped the box cutter, but Petitioner continued to maintain "control" of her. (ECF No. 8-18 at Page ID.1763-66). Petitioner eventually pulled off the road at which point he noticed that White was no longer breathing. (ECF No. 8-18 at Page ID.1767-68). Petitioner contended that he acted in self-defense and that had he not acted as he did, White "would have cut [him] up." (ECF No. 8-18 at Page ID.1806-07).

       The testimony presented by the prosecution, however, belied Petitioner's claim of self-defense. At the time of White's killing, Petitioner was six feet five inches tall and weighed approximately 300 pounds. (ECF No. 8-17 at Page ID.1580). Annette White, on the other hand, was five feet two inches tall and weighed 103 pounds. (ECF No. 8-14 at Page ID.1118-19). Moreover, on the night she was killed, Annette White was wearing a splint because she had recently fractured her left wrist. (ECF No. 8-14 at Page ID.1147-50; ECF No. 8-15 at PageID.1242).

       The doctor who performed the autopsy on Annette White testified that White died from manual strangulation. (ECF No. 8-14 at Page ID.1120-21). In response to Petitioner's

9

testimony that he did not choke White and was instead only "holding her" away, the doctor reiterated that there existed no question in his mind that White was killed by manual strangulation. (ECF No. 8-19 at Page ID.1915-16). The doctor further testified that it requires the application of "significant force" for a significant length of time to kill someone by manual strangulation. (ECF No. 8-14 at Page ID.1124). Specifically, the doctor testified that it would take approximately 30 seconds to render the person unconscious and at least 4-5 minutes to kill them. (ECF No. 8-14 at Page ID.1124-25).

When police searched the vehicle Petitioner was driving on the night he killed White, a box cutter was discovered. (ECF No. 8-14 at Page ID.1167, 1184-93; ECF No. 8-16 at PageID.1466-75). An examination of the box cutter revealed no evidence of blood. (ECF No. 8-14 at Page ID.1194). Petitioner did not contact the police or other authority after killing Annette White, but instead simply dumped her body face down in the woods. (ECF No. 8-14 at Page ID.1092-93, 1097-99, 1102-04; ECF No. 8-18 at PageID.1842-43). An investigation of the area where White's body was dumped revealed the presence of shoeprints. (ECF No. 8-14 at PageID.1152-60, 1168-69). Petitioner subsequently attempted to discard the shoes he was wearing on the night he killed Annette White. (ECF No. 8-15 at PageID.1392-1420, 1428-33). Police, however, recovered these shoes and an examination revealed that Petitioner's shoes were consistent with the shoeprints discovered near Annette White's body. (ECF No. 8-14 at PageID.1152-60).

An acquaintance of Petitioner testified that immediately after watching a news report regarding Annette White's death, Petitioner stated that he "done it." (ECF No. 8-15 at PageID.1349-55). Petitioner stated that things with White "got out of hand" and he "had to off her." (ECF No. 8-15 at PageID.1357). Only five days before he choked Annette White to death, Petitioner, without

10

provocation, attacked another woman and choked her until she was unconscious. (ECF No. 8-15 at PageID.1434-48). When Petitioner was interviewed by the police, he initially blamed White's killing on somebody else and stated that he had only been involved with dumping her body in the woods. (ECF No. 8-16 at PageID.1524-25). Petitioner only later asserted that he acted in self-defense. (ECF No. 8-16 at PageID.1531).

Given the severe disparity in size and weight between Petitioner and Annette White, as well as the fact that White had a fractured left wrist at the time, it was not unreasonable for the jury to find unpersuasive Petitioner's testimony that self-defense necessitated that he manually strangle White with "significant force" for several minutes until she was dead. That Petitioner did not contact the police following White's death and instead simply dumped her body in the woods would further undercut in the mind of any reasonable juror Petitioner's claim of self-defense. Petitioner's subsequent attempt to discard evidence placing him at the scene where White's body was dumped further undermines Petitioner's claim of self-defense. Likewise, evidence that Petitioner had only a few days before killing White choked a different woman until she was unconscious undercut Petitioner's claim of self-defense. Finally, evidence that Petitioner stated to an acquaintance that he "had to off" White following an altercation of some kind and later lied to the police about the events in question completely diminish Petitioner's claim that he reasonably acted in self-defense. In sum, it was completely reasonable for the jury to reject Petitioner's claim of self-defense and to instead find that Petitioner committed first degree murder.

B.      Juror Testimony

All the jurors who decided Petitioner's fate testified at the post-conviction hearing ordered by the Michigan Supreme Court. (ECF No. 8-24; ECF No. 8-25). Several jurors noticed that Petitioner was shackled during the trial. However, none of these jurors placed any significance on this fact and simply considered it routine procedure. The fact that Plaintiff was shackled was not discussed during jury deliberations and the jurors testified that their votes were based upon the evidence presented at trial. In sum, there was no evidence that the fact that Petitioner was shackled during his trial had any impact or influence on the jury's deliberations or decision.

As noted above, the state courts determined that the prosecution had demonstrated beyond a reasonable doubt that the fact that Petitioner was shackled during his trial did not contribute to the jury's guilty verdict. Accordingly, Petitioner's claim of constitutional violation was rejected. In light of the authority and evidence identified above, the Court concludes that this determination is neither contrary to, nor involves an unreasonable application of, clearly established federal law. Furthermore, this decision was not based on an unreasonable determination of the facts in light of the evidence presented. Accordingly, this claim raises no issue upon which habeas relief may be granted.

## CONCLUSION

For the reasons articulated herein, the undersigned concludes that Petitioner is not being confined in violation of the laws, Constitution, or treaties of the United States. Accordingly, the undersigned recommends that Davenport's petition for writ of habeas corpus be **denied**. The undersigned further recommends that a certificate of appealability be denied. *See Slack v.*

*McDaniel*, 529 U.S. 473 (2000).

        OBJECTIONS to this Report and Recommendation must be filed with the Clerk of Court within 14 days of the date of service of this notice.  28 U.S.C. § 636(b)(1)(C).  Failure to file objections within the specified time waives the right to appeal the District Court's order.  *Thomas v. Arn*, 474 U.S. 140 (1985); *United States v. Walters*, 638 F.2d 947 (6th Cir. 1981).

        Respectfully submitted,

Date:  November 7, 2016
        /s/ Ellen S. Carmody
ELLEN S. CARMODY
United States Magistrate Judge